IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MONTANILE,                    )
                              )
      Plaintiff,              )
                              )
          v.                  )     1:08cv716 (JCC)
                              )
BOTTICELLI, et al.,           )
                              )
      Defendants.             )

**M E M O R A N D U M   O P I N I O N**

This matter comes before the Court on Plaintiff Denise Montanile's ("Montanile's") Notice of Appeal of an order entered by the magistrate judge striking her complaint and prohibiting her from testifying at trial ("Magistrate Order").  Also before the Court are motions for summary judgment submitted by Defendant Tom Botticelli ("Botticelli") and Defendant United Parcel Service, Inc. ("UPS").  For the following reasons, the Court will grant in part and deny in part Montanile's appeal, affirm the discovery sanction forbidding Montanile from testifying in her defense, vacate the sanction striking her Amended Complaint, and, as a replacement sanction, forbid her from testifying in her case in chief.  The Court will then grant Botticelli's motion for summary judgment as to Montanile's claims against him, grant Botticelli's motion for summary judgment as to his second counterclaim against Montanile, dismiss Botticelli's claim for

1

specific performance, and grant UPS's motion for summary judgment.

## I. Background

Montanile brought this suit against Defendants Tom Botticelli ("Botticelli") and United Parcel Service ("UPS") (collectively, "Defendants") for actions arising out of Botticelli's attempt to purchase vintage baseball cards from Montanile.  After the cards were not delivered, Botticelli accused Montanile of defrauding him.  Montanile was then arrested and extradited from New Jersey to Virginia, where the prosecutor decided to *nolle prosequi* the charges.  Montanile brought claims for malicious prosecution (Count I) and false arrest and imprisonment (Count II) against Botticelli and a claim for violations of 49 U.S.C. § 14706 (Count III) against UPS.  (Am. Compl. 2-7.)

On May 14, 2009, the magistrate judge in this matter ("Magistrate") held a hearing on Defendants' Rule 37 motions for discovery-related sanctions against Montanile.  Botticelli claimed that Montanile failed to comply with the Magistrate's order to produce full and complete discovery responses and to re-appear for a second deposition.  (Botticelli Rule 72 Mot. 1-4.) UPS's motion was similar in substance.  (UPS Rule 72 Mot. 1.)

Defendants claimed that Montanile's refusal to submit to the second deposition and her failure to respond to interrogatory requests unfairly prejudiced their ability to

2

defend themselves.  They requested sanctions in the form of, *inter alia*, an order precluding Montanile from testifying at trial.  (Botticelli Rule 72 Mot. 5; Botticelli Mot. for Sanctions.)  Montanile filed a one-page opposition.

On May 14, 2009, after a hearing on the motions, the Magistrate entered an order granting Defendants' motions for sanctions, striking the amended complaint, and prohibiting Montanile from testifying at trial regarding the counterclaims against her.  (Mag. Order.)  The Magistrate Order states that it was issued "[f]or the reasons stated from the bench, and in accord with specific rulings made at that time."

On May 21, 2009, Montanile filed a one-page Notice of Appeal ("Notice of Appeal").  On June 1, 2009, Montanile filed a one-page Motion for Reconsideration ("Motion for Reconsideration").  Defendants filed a joint opposition to Montanile's appeal and motion on June 5, 2009.  In an Order issued on July 9, 2009, the Court found that the portion of the Magistrate Order striking the Amended Complaint must be reviewed *de novo* and ordered a transcript of the May 14, 2009 sanctions hearing.  It subsequently ordered a transcript of the April 28, 2009 motion to compel hearing that preceded Defendants' motions for sanctions.

On June 11, 2009, UPS moved for summary judgment based on the Magistrate Order striking the Amended Complaint against it.  On June 22, 2009, Botticelli moved for summary judgment on

Montanile's claims against him and his Virginia Consumer Protection Act counterclaim against her.  Montanile did not oppose either motion for summary judgment.  Montanile's appeal and Defendants' motions for summary judgment are before the Court.

## II.  Standard of Review

A. <u>Non-Dispositive Motions Under Rule 72(a)</u>

Rule 72(a) of the Federal Rules of Civil Procedure permits a party to submit objections to a magistrate judge's ruling on non-dispositive matters such as discovery orders.  Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A); *see Fed. Election Comm'n v. The Christian Coalition*, 178 F.R.D. 456, 459-60 (E.D. Va. 1998) (*citing Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990)).  Review of a magistrate's discovery order, usually a non-dispositive matter, is properly governed by the "clearly erroneous or contrary to law" standard of review.  *See Jesselson v. Outlet Assocs. of Williamsburg, Ltd. P'ship*, 784 F. Supp. 1223, 1228 (E.D. Va. 1991).

Only if a magistrate judge's decision is "clearly erroneous or contrary to law" may a district court modify or set aside any portion of the decision.  Fed. R. Civ. P. 72(a); *see* 28 U.S.C. § 636(b)(1)(A).  A court's "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *see also Harman v. Levin*, 772 F.2d 1150, 1152 (4th Cir. 1985).  The leading treatise on federal practice and procedure describes the alteration of a magistrate's non-dispositive order as "extremely difficult to justify."  12 Charles Alan Wright et al., Federal Practice and Procedure § 3069 (2d ed. 1997).  "[A]lthough an abuse-of-discretion attitude should apply to many discovery and related matters," the treatise further states, "it need not curtail the power of the district judge to make needed modifications in the magistrate judge's directives." *Id.*

B. Dispositive Motions Under Rule 72(b)

        The Federal Magistrate's Act provides that a district judge shall make a *de novo* determination of those portions of a report and recommendation to which objection is made.  28 U.S.C. § 636(b)(1)(C); *see* Fed. R. Civ. P. 72(b).  A judge also "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate," *id.*; *see also Beck v. Angelone*, 113 F. Supp. 2d 941, 947 (E.D. Va. 2000), *appeal dismissed by* 261 F.3d 377 (4th Cir.), *cert. denied*, 534 U.S. 987 (2001), and may receive further evidence or recommit the matter to the magistrate with instructions.  24 U.S.C. § 636(b)(1)(C).

C. <u>Summary Judgment</u>

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted). The party seeking summary judgment has the initial burden of showing the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The party opposing summary judgment may not rest upon mere allegations or denials. Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quotation omitted). In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier

6

of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

### III. Analysis

A. <u>Rule 72 Appeal of the Discovery Sanctions</u>

As explained in the Court's Order of July 9, 2009, the Court will conduct a *de novo* review of the portion of the Magistrate Order that strikes Montanile's complaint – which effectively ended her case against Defendants – pursuant to Rule 72(b).  (Order of July 9, 2009 at 3-6 (*citing Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1462 (10th Cir. 1988) (equating the decision to strike a party's pleadings with "involuntary dismissal")).)  It will review the portion of the Magistrate Order that bars Montanile from testifying as to the counterclaims against her under the more permissive Rule 72(a) standard for non-dispositive magistrate decisions.  (Order of July 9, 2009 at 5.)

1. <u>Rule 72(b) Review of the Dispositive Sanction</u>

As noted in the Court's July 6, 2009 Order, the Court will review the portion of the Magistrate Order striking the Amended Complaint, which effectively ends Montanile's case against Defendants, *de novo*.

As a Rule 37 sanction for discovery violations, a court may, among other actions, "strik[e] pleadings in whole or in part," "dismiss[] the action or proceeding in whole or in part,"

7

or "render[] a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A).  The Supreme Court, in *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976), upheld a district court's Rule 37 dismissal of a case for discovery violations.  "[T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct . . . ."  *Id.* at 643.

Recognizing the inherent conflict between a court's need to enforce its discovery orders and a party's right to its day in court, the Fourth Circuit set out a four-part test to determine when a party's discovery abuses justify the sanction of default:

> (1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions.

*Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 92 (*citing Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 503-06 (4th Cir. 1977), *cert denied*, 434 U.S. 1020 (1978)).  In subsequent cases, the court "emphasized the significance of warning a defendant about the possibility of default before entering such a harsh sanction."  *Hathcock v. Navistar Int'l*

8

*Trans. Corp.*, 53 F.3d 36, 40 (1995) (*citing Choice Hotels Int'l v. Goodwin & Boone*, 11 F.3d 469, 473 (4th Cir. 1993); *Lolatchy v. Arthur Murray, Inc.*, 816 F.2d 951 (4th Cir. 1987)).

   a. <u>Discovery Abuses and Magistrate Court Proceedings</u>

     Here, the discovery abuses that led to the sanction were legion.  Botticelli first filed a motion to compel on April 17, 2009.  He complained that Montanile had served incomplete or non-existent responses to his first set of interrogatories and first request for production.  (Mot. to Compel 2.)  Montanile answered "I don't recall" to a many of the interrogatories, including those asking about verifiable facts like the annual revenue of Montanile's company, whether she had been the subject of previous arrests, criminal prosecutions, or civil lawsuits, and whether she had received other customer complaints since 2005.  Montanile also failed to produce documents responsive to Botticelli's legitimate requests.  (Mot. to Compel 2 & Exs. 1-2.) In short, Montanile's responses to the discovery requests were woefully inadequate.

     By the April 28, 2009 hearing on Botticelli's motion to compel, Defendants' counsel had deposed Montanile.  The deposition confirmed that Montanile had given incomplete answers to the earlier discovery requests.  (Mot. to Compel Hr'g Tr. 3-5.)  Montanile's failure to provide the information requested and to review pertinent documents prior to her deposition made the

deposition a largely useless exercise.  At the hearing, the Magistrate found Montanile's responses to the discovery requests "grossly inadequate" and required her to serve supplemental answers to the interrogatories and the document request.  (Mot. to Compel Hr'g Tr. 8.)  After finding that her performance at the deposition was also far less than adequate, the Magistrate ordered Montanile to sit for another deposition.  (Mot. to Compel Hr'g Tr. 9.)

On May 8, 2009, Defendants moved for sanctions against Montanile.  Botticelli claimed that, after the Magistrate issued the order compelling her to respond to discovery requests and to re-appear for a second deposition, Montanile refused to do so. (Botticelli Mot. for Sanctions 2-4.)  Montanile did not provide any further interrogatory responses and disclosed only several pages from tax returns and several scraps of paper.  (Botticelli Mot. for Sanctions 3.)  Botticelli noted that Montanile claimed that she could not re-appear because of a family member's health issue, but that "when asked for alternative dates, Ms. Montanile's counsel indicated that she was angry and will not return to the area for her deposition at any time."  (Botticelli Mot. for Sanction 3-4.)  Counsel for Botticelli also found, through court records searches in Montanile's home county, that she had been a party to more than 45 civil lawsuits and had been arrested several times – facts directly relevant to questions he had asked at Montanile's first deposition, and to which he had

10

received misleading and incomplete answers.  (Sanctions Hr'g Tr. 3; UPS Summ. J. Mot. Ex. 1 at 199.)  As sanctions, Botticelli asked the Court to preclude Montanile from testifying at trial. (Botticelli Mot. for Sanctions 4-7.)

At the hearing, Montanile's counsel claimed that she did not appear at her deposition because she was caring for a terminally-ill family member.  He also stated that she may have sent him several documents that he had not yet received because he had been out of the office the preceding day.

The Magistrate noted that, while he did not "get to use the word 'obdurate' very often," he thought that "that word best characterizes this plaintiff's approach to the Court's orders and the requirements of the Federal Rules of Civil Procedure." (Sanctions Hr'g Tr. 5.)  The Magistrate reasoned that prohibiting Montanile from testifying – the sanction requested by Defendants – would be tantamount to striking her Amended Complaint.  He found as follows:

> [T]hat the plaintiff is in willful violation of the Court's orders, and that no relief short of terminating sanctions is appropriate with respect to the complaint. I am not going to do that with respect to the counterclaim.  But this plaintiff has consistently ignored her responsibilities and is entitled to no further leeway from the Court.

He then entered an order striking the Amended Complaint and forbidding Montanile from testifying at the trial on Botticelli's counterclaim against her.  (Sanctions Hr'g Tr. 6-8.)

b. <u>Whether the Sanctions Were Appropriate</u>

Montanile's conduct in this litigation easily meets the first three prongs of the Rule 37 dismissal inquiry. *See Mut. Fed. Sav. & Loan Ass'n*, 872 F.2d at 92 (citation omitted). The inadequate production and contradictory statements about what information she possessed, coupled with her failure to make a good-faith effort – or any effort at all – to comply with the Magistrate's order, all show that Montanile acted in bad faith during discovery. It is abundantly clear that Montanile, faced with the consequences of filing this lawsuit, decided to stonewall by refusing to turn over materials subject to discovery and by obscuring what sources of information she had access to. Second, her non-compliance severely prejudiced Botticelli and UPS, because it buried the most important source of information they may have had about Montanile's actions with regard to the package at issue, her business history, and the damages that she claimed.[1] Third, the Court cannot appear to tacitly sanction such behavior through inaction. Montanile's conduct was egregious, and to let it pass without sanction would make a mockery of the Federal Rules.

That said, the Court will vacate the portion of the Magistrate Order striking the Amended Complaint and, as an alternative sanction for Montanile's discovery abuses, will enter

---

[1] For example, if this case progressed to trial, evidence of Montanile's arrest history could have been important to determining the amount of "pain and suffering" caused by her arrest in New Jersey.

12

an order forbidding her from testifying in support of her claims
– the sanction originally sought by Defendants.

First, the Court does not have before it any indication
that the Magistrate warned Montanile that her discovery conduct
could effectively end her case.  The Fourth Circuit generally
requires a court to put a litigant on notice that continued
intransigence will lead to dismissal.  *Hathcock*, 53 F.3d at 40;
*see also Pandolfo v. Howard Perry & Watson Realty, Inc.*, 2007 WL
1847287, at *3 (E.D.N.C. June 25, 2007) (citation omitted); *PVD
Plast Mould Indus., Ltd. v. Polymer Group, Inc.*, 2001 WL 1867801,
at *4 (D.S.C. Feb. 1, 2001) (citations omitted).

Second, a less drastic sanction may have been
effective.  "[C]ourts uniformly have held that orders dismissing
the action or granting judgments on default as sanctions for
violating discovery orders are generally deemed appropriate only
as a last resort, or when less drastic sanctions would not ensure
compliance with a court's orders."  7 Moore's Federal Practice
§ 37.50 (2009).  A court should give adequate consideration to
the effectiveness of lesser sanctions before imposing a sanction
that ends a party's case.  *See id.*  Here, the Magistrate struck
Montanile's Amended Complaint as the first sanction for her
violation of the order compelling her to produce certain
documents and answers.

The Court recognizes that Montanile's lapses were of a
piece with her prior failure to produce discoverable material.

13

Looking at the established pattern of discovery abuse, it was fair for the Magistrate to believe that such abuse would continue unabated without a "final" sanction.  But the Court does not agree that striking the Amended Complaint as a first sanction, without informing Montanile that such an option was on the table – and without Defendants having requested that particular sanction – was the proper remedy in this situation.[2]

Instead, the Court finds that the sanction requested by Defendants, which would forbid Montanile from testifying at trial, adequately addresses the discovery abuses.  Montanile's actions had the practical effect of keeping Defendants in the dark about what she knew, what she did, and what she would testify to when called to the stand.  The Court finds it appropriate to bar her testimony in light of her willful attempts to hide her business history from the Defendants and her almost comically incomplete discovery responses.

As the Magistrate surmised, and as borne out below, *see infra subpart* III.B., the Court's order forbidding Montanile from testifying does have the practical effect of ending her case on Defendants' summary judgment motions.  The sanction, however, is

---

[2] The Court also recognizes that this could be seen as splitting hairs, especially as the evidence produced by Botticelli, when combined with the sanction imposed by the Court, also ends Montanile's case.  *See infra* subpart III.B.  Indeed, the hearing transcript shows that the Magistrate understood that only the district court could enter a final order ending Montanile's case.  (May 14 Mag. Hr'g Tr. 7-8.)  Considering the procedural posture of this case and the Rule 72 jurisprudence cited above, however, the Court believes that an order barring Montanile from testifying is the better remedy.

14

non-dispositive: it was up to Montanile to marshal evidence that would show a material fact in dispute.  Her failure to do so does not concern the Court and does not make the discovery sanction itself dispositive.  Montanile brought this case in federal court.  She is responsible for its conduct.  That she may have decided, mid-way through the litigation, that she no longer wanted to be deposed or to reveal information to which Defendants have a right, does not change the fact that she instituted a case against Botticelli and UPS which is quickly moving towards a trial date.  They must be given the fair means to defend themselves.  The Court will not allow Montanile to dodge all of her discovery obligations and still testify in her own behalf. It will order, as a replacement Rule 37 sanction, that she be forbidden from testifying in her case in chief.

### 2. Rule 72(a) Review of the Non-Dispositive Sanction

The Magistrate's decision to forbid Montanile from testifying at the trial of Botticelli's counterclaims against her was not dispositive.  Botticelli bears the burden of proof at trial and must show a right to relief by a preponderance of the evidence at trial regardless of whether Montanile testifies in her own defense.  (May 14 Mag. Hr'g Tr. 7.)  Thus, this Court reviews the portion of the Magistrate Order barring Montanile from testifying at trial under Rule 72(a)'s "clearly erroneous" standard.  Fed. R. Civ. P. 72(a).  For the reasons outlined above, it will uphold the Magistrate's decision.  The Court finds

15

no error in the Magistrate's sanction barring Montanile from testifying at trial as to the counterclaims.

B. Motions for Summary Judgment

1. Botticelli's Motion for Summary Judgment

Botticelli moves for summary judgment on both claims that Montanile brought against him and on one of the counterclaims that he brought against her. At oral argument, Botticelli's counsel stated that, if the Court grants his motion for summary judgment on the Virginia Consumer Protection Act ("VCPA") claim, that decision would obviate what was in essence an alternative claim for specific performance. Because the Court, for the reasons outlined below, will grant the motion for summary judgment on the VCPA claim, it will dismiss the alternative claim for specific performance.

a. Undisputed Facts

Montanile did not file a timely opposition to Botticelli's motion for summary judgment and did not submit any facts that contradict those submitted by Botticelli. *See* Local Civil Rule 56 ("[T]he Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.") The undisputed facts are as follows.

On July 14, 2006, Botticelli e-mailed Montanile to ask about buying vintage baseball cards advertised for sale on her

website.[3]  Montanile assured him that the "grades" of the cards were guaranteed.  (Botticelli Decl. ¶ 4; Duncan Decl. Ex. 2.)  On July 15, 2006, Botticelli e-mailed Montanile to tell her that, because she was guaranteeing the "grades" of the cards, he would send her $7,280.00 for six rare baseball cards.  He stated that, because he had not seen scans of the cards, he assumed that Montanile would offer a full money-back guarantee.  Montanile accepted the offer.  (Botticelli Decl. ¶ 4; Duncan Decl. Ex. 2.) Botticelli mailed Montanile a check for $7,280.00.  She deposited the check on or before July 21, 2006.  (Botticelli Decl. ¶ 4; Duncan Decl. Ex. 3.)

On August 10, 2006, and again on August 16, 2006, Botticelli e-mailed Montanile to check on the status of his order.  He also requested a tracking number for the shipment. Montanile told him that his shipment was still being processed and, after the August 16 e-mail, told him that "[w]e are scheduled to ship by Friday."  (Botticelli Decl. ¶¶ 5-6; Duncan Decl. Ex. 2.)  On August 23, 2006, Botticelli contacted Montanile once again.  This time he asked for the status of the delivery and a tracking number.  He also requested a refund if the cards were not delivered by Saturday, August 26.  (Botticelli Decl. ¶ 6; Duncan Decl. Ex. 2.)

_____

[3] The cards depicted a veritable who's who of early baseball stars, including Adrian "Cap" Anson, Napoleon "Nap" Lajoie, Tim Keefe, Charles "Chief" Bender, and Honus Wagner – although, it should be noted, the Pittsburgh legend's card was not the T206 American Tobacco Company likeness, the most sought after baseball card of all.  (Countercl. ¶ 2.)

Montanile replied on August 24, 2006.  She told Botticelli that "[w]e always wait a minimum of 2 weeks for payments to clear our bank regardless of their status.  I believe it is on it's [sic] way & will send the tracking number shortly." (Duncan Decl. Ex. 2.)  On August 29, 2006, Botticelli e-mailed Montanile and told her that, because she was ignoring his phone calls and e-mails, and had not sent him the cards, he was meeting with the police.  (Duncan Decl. Ex. 2.)  This spurred some movement on Montanile's part.  She e-mailed Botticelli and told him that there had been a delay in shipping and that she had not, in fact, had all of the cards advertised, but that the package was leaving that day.  (Duncan Decl. Ex. 2.)  On August 30, 2006, Montanile e-mailed Botticelli to tell him that UPS had shipped his package earlier that day.  (Duncan Decl. Ex. 2.)  On September 1, 2006, Botticelli opened the box shipped by UPS.  It contained an invoice but no baseball cards.  (Botticelli Decl. ¶ 9; Duncan Decl. Ex. 2.)  Montanile later told Botticelli that he would be refunded when UPS paid the insurance on the package. (Duncan Decl. Ex. 2.)  She never refunded Botticelli's money.

Contrary to what her e-mails implied, Montanile's business was actually a sole proprietorship that she ran out of her home.  Thus, her statement that she "believe[d the package] is on it's [sic] way" and that the order was somehow held up in processing were patently false.  (Montanile Depo. 8:5-9:19, 10:14-11:3, and 28:22-32:16.)

18

The Fairfax Police Department conducted a criminal investigation after Botticelli filed a complaint.  The evidence indicated that, at the time she induced Botticelli to pay for them, Montanile did not possess any of the six baseball cards advertised on her website that Botticelli ordered.  (Duncan Decl. ¶ 3 & Ex. 6.)

An investigation into Montanile's business history reveals a pattern of fraud and deception.  She claimed to have shipped a Ty Cobb-autographed baseball to Coach's Corner Sports Auctions, LLC ("Coach's Corner") and then falsely claimed that Coach's Corner had received the baseball and failed to put it up for auction.  She filed suit against Coach's Corner, demanding that it pay her for the baseball.  In fact, Coach's Corner never received the Ty Cobb baseball.  (Malack Decl. ¶¶ 1-9.)  After Coach's Corner barred her from doing further business with its auction house, she used an alias, "Joe Montan," through which she shipped low-value items to Coach's Corner to be sold on consignment through an online auction.  Montanile would use other aliases to post fake, inflated auction bids for the low-value items.  After the auction closed, "Joe Montan" would demand that Coach's Corner send the inflated consignment auction proceeds to "him."  Coach's Corner, of course, never received payment for the low-value items that were fraudulently "bid up" by Montanile.  (Malack Decl. ¶¶ 9-12.)  The mailing address of "Joe Montan" was

later found to be the same as the mailing address for Montanile. (Malack Decl. ¶¶ 12-17.)

Montanile perpetrated a similar sports-memorabilia fraud against Ralph Spencer ("Spencer"), a retired minister in Canada.  He found Montanile's company on the Internet and contacted her to see if she had any interest in purchasing his vintage baseball card collection.  She told him that he should send her his collection so that she could review it and then make him an offer.  Spencer then sent her his collection of 341 vintage baseball cards, worth approximately $19,750.00.  (Spencer Decl. ¶¶ 1-18.)  One week later, she offered him $1,000.00 for the collection.  He declined the offer and asked her to return the cards.  Montanile refused to do so; she claimed to have already sold several of them and told him that she wanted to be compensated for the time she had spent valuing the collection. Spencer paid her, after which she sent him a box containing only 63 baseball cards – most of which were damaged and different from the cards he had sent her.  Montanile continued to sell Spencer's cards on her website.  (Spencer Decl. ¶¶ 6-18.)

In the present case, Montanile claimed that Botticelli falsely swore out a complaint to have her arrested and malicious prosecuted her.  She also claimed that UPS's actions violated the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706.

b. <u>Montanile's Claims Against Botticelli</u>

Botticelli asks the Court to grant summary judgment in his favor on Montanile's claims of false arrest and malicious prosecution.  Montanile did not oppose his motion for summary judgment.  She did not submit any evidence showing a material dispute of fact or otherwise showing that summary judgment should not issue.

i. <u>False Arrest</u>

False arrest is a species of false imprisonment; in Virginia, the torts are analogous.  *See Motley v. Virginia Hardware & Mfg. Co.*, 287 F. Supp. 790, 792 (W.D. Va. 1968); *see also Coughlan v. Jim McKay Chevrolet, Inc.*, 18 Va. Cir. 265, 1989 WL 646497, at *1 (Va. Cir. Ct. 1989); 32 Am. Jur. 2d False Imprisonment § 3.  False imprisonment requires "the direct restraint by one person of the physical liberty of another without adequate legal justification."  *W.T. Grant Co. v. Owens*, 149 Va. 906, 921, 141 S.E. 860, 865 (1928) (quotation omitted); *see also Jordan v. Shands*, 255 Va. 492, 497, 500 S.E.2d 215, 218 (1998) (citing *W.T. Grant*'s definition of false imprisonment).

In order to state a claim for false imprisonment, a plaintiff must allege that the process leading to the arrest was unlawful.  *Cole v. Eckerd Corp.*, 54 Va. Cir. 269, 2000 WL 33595085, at *2 (Va. Cir. Ct. 2000).  A warrant that is regular on its face - even one procured without probable cause - does not

create a cause of action for false imprisonment. *Id*. at *3 (*citing Coughlan*, 18 Va. Cir. 265, 1989 WL 646497, at *1).

Here, the facts make it abundantly clear that Montanile cannot prove false arrest. The warrant was regular on its face, and there was nothing unseemly about the process by which it was procured. (Duncan Decl. ¶ 4 & Ex. 8 (copy of arrest warrant.)) Indeed, Montanile has neither opposed Botticelli's motion for summary judgment on the false arrest claim nor submitted any contradictory evidence or anything that would create a genuine issue of material fact. Botticelli is entitled to judgment as a matter of law on the false arrest claim.

## ii. Malicious Prosecution

In Virginia, suits "for malicious prosecution arising from criminal proceedings" are judicially disfavored. *Reilly v. Shepherd*, 273 Va. 728, 733, 643 S.E.2d 216, 218 (2007). "The requirements for maintaining such actions are more stringent than those applied to other tort cases, and are imposed to encourage criminal prosecutions in appropriate cases without fear of reprisal by civil actions." *Id*. (*citing Ayyildiz v. Kidd*, 220 Va. 1080, 1082, 266 S.E.2d 108, 110 (1980)).

A plaintiff must prove four elements to prevail on a malicious prosecution claim under Virginia law. The cause of action requires proof that a defendant "(1) instituted or procured a criminal prosecution of the plaintiff; (2) without probable cause; (3) acted maliciously; and (4) the prosecution

was terminated in a manner not unfavorable to the plaintiff."
*Brice v. Nkaru*, 220 F.3d 233, 237 (4th Cir. 2000); *see also
Reilly*, 273 Va. at 732; *Baker v. Elmendorf*, 271 Va. 474, 476, 628
S.E.2d 358, 359 (2006).

By Virginia statute, a magistrate or other officer
authorized to issue criminal warrants can issue an arrest warrant
after finding probable cause to believe that an accused has
committed an offense.  Va. Code Ann. § 19.2-72.  The probable
cause determination occurs after an examination, on oath, of the
person complaining of the criminal offense or of other witnesses.
*Id*.  Thus, probable cause depends on the sworn testimony of a
complainant or of witnesses summoned by a law enforcement
officer.  "In the context of a malicious prosecution action,
probable cause is defined as knowledge of such facts and
circumstances to raise the belief in a reasonable mind, acting on
those facts and circumstances, that the plaintiff is guilty of
the crime of which he is suspected."  *Andrews v. Ring*, 266 Va.
311, 323, 585 S.E.2d 780, 786 (2003); *Bain v. Phillips*, 217 Va.
387, 228 S.E.2d 576, 581 (1976).  The question whether probable
cause existed "is to be applied as of the time when the action
complained of was taken."  *Lee v. Southland Corp.*, 219 Va. 23,
26, 244 S.E.2d 756, 759 (1978).

Virginia courts have defined "probable cause" as
"knowledge of such a state of facts and circumstances as excite
the belief in a reasonable mind, acting on such facts and

circumstances, that the plaintiff is guilty of the crime of which he is suspected." *Giant of Va., Inc. v. Pigg*, 207 Va. 679, 684, 152 S.E.2d 271, 275 (1967) (quotation omitted); *see also Westreich v. McFarland*, 429 F.2d 947, 948 & n.2 (4th Cir. 1970) (*citing Giant of Virginia* as stating the "preferred definition" in Virginia).

Here, a reasonable jury could only find that probable cause existed to arrest Montanile. A reasonable person would have believed that Montanile was guilty of obtaining money by false pretenses. The undisputed evidence also shows that Botticelli did not act with malice in swearing out a criminal complaint against Montanile. Again, Montanile does not oppose the motion for summary judgment and has not submitted any evidence that would create a genuine issue of material fact. Botticelli is entitled to judgment as a matter of law on the malicious prosecution claim.

c. <u>Botticelli's Counterclaims Against Montanile</u>

Botticelli moves for summary judgment on Count II of his counterclaim, for Montanile's alleged violation of the Virginia Consumer Protection Act (the "VCPA").

First, the Court notes that Montanile, in her "Answer" to the Counterclaims, did not actually answer the allegations paragraph-by-paragraph. Nor did she deny any of the alleged facts. (Montanile Ans. 1.) Instead, her one-page "Answer" asks the Court to dismiss the Counterclaims for failure to state a

claim for relief.  It denies the possibility of specific performance and claims that Botticelli's VCPA claim was filed outside the statute of limitations.[4]  (Montanile Ans. 1.)

Montanile argues that any VCPA claim accrued as early as September 17, 2006, when Botticelli met with UPS investigators.  The Counterclaims were filed on December 18, 2008, which would normally fall outside the two-year statute of limitations provided in the VCPA.  Va. Code Ann. § 59.1-204.1 ("Any individual action pursuant to § 59.1-204 . . . shall be commenced within two years after such accrual.  The cause of action shall accrue as provided in § 8.01-230.")  Section 8.01-230 states that, when an action specifies a limitations period, the right of action "accrues," and the limitations period begins to run, "from the date the injury is sustained [or] when the breach of contract occurs in actions ex contractu . . . except . . . where otherwise provided under § 8.01-233."  Section 8.01-233, in turn, tolls the statute of limitations for a counterclaim when it "arises out of the same transaction or occurrence upon which the plaintiff's claim is based."

---

[4] Additionally, at oral argument, counsel for Montanile suggested that the Court would lack jurisdiction over Botticelli's state law counterclaim if it granted summary judgment against Montanile.  This is not correct.  First, Montanile and Botticelli are diverse, and Botticelli requests more than $75,000 on his VCPA claim.  (Botticelli Mot. for Summ. J.)  Even if diversity jurisdiction did not exist, the Court would exercise supplemental jurisdiction over Botticelli's compulsory state law counterclaims.  *See Peter Farrell Supercars, Inc. v. Monsen*, 82 Fed. Appx. 293 (4th Cir. Dec. 3, 2003) (approving a district court's decision to exercise supplemental jurisdiction over a compulsory VCPA counterclaim after the plaintiff's federal claim was dismissed).

Botticelli's VCPA claim arises out of the same botched baseball card sale as Montanile's claims against him.  Thus, the limitations period was tolled when Montanile filed suit in July 2008 – less than two years after Botticelli's right of action accrued.  *See Burlington Indus. v. Milliken & Co.*, 690 F.2d 380, 389 (4th Cir. 1982) (compulsory counterclaim relates back to the time the plaintiff's complaint is filed); *see also Kirkpatrick v. Lenoir County Bd. of Educ.* 216 F.3d 380, 387-88 (4th Cir. 2000); Fed. R. Civ. P. 13(a) (defining a compulsory counterclaim).  Thus, the statute of limitations does not bar Botticelli's VCPA claim.  And Montanile has not answered any of Botticelli's factual allegations.

    The VCPA, Va. Code Ann., §§ 59.1-196 to 59.1-207, outlaws a number of fraudulent acts and practices related to the sale of "goods."  *Id.* at § 59.1-200.  Such unlawful acts, when committed by a "supplier," in connection with a "consumer transaction," subject the "supplier" to civil prosecution and to a private recovery action.  *Id.* at §§ 59.1-200, 59.1-201 to 59.1-204.  The law provides for the private recovery of actual damages and attorney's fees; willful violations allow the fact-finder to impose up to treble damages.  *Id.* at § 59.1-204(A)-(B).

    The VCPA defines "goods" as "all real, personal or mixed property, tangible or intangible."  *Id.* at § 59.1-198.  It defines a "consumer transaction" as, *inter alia*, "[t]he advertisement, sale, lease, license or offering for sale, lease

or license, of goods or services to be used primarily for personal, family or household purposes." *Id.* A "supplier" is "a seller, lessor or licensor who advertises, solicits or engages in consumer transactions . . . .". *Id.* Here, the baseball cards, which are personal, tangible property, qualify as "goods." Montanile, who advertised baseball cards for sale over the Internet and engaged in a "consumer transaction" with Botticelli – that is, the advertisement and offering for sale of goods used for personal purposes – is included within the definition of a "supplier." The only remaining question, then, is whether the undisputed facts show that Montanile committed one of the unlawful practices outlined in Va. Code Ann. § 59.1-200.

Section 59.1-200 makes the following fraudulent acts or practices unlawful: (1) "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services"; (2) "[m]isrepresenting that goods or services are of a particular standard, quality, grade, style, or model"; (3) "[a]dvertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised"; (4) "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction"; (5) "[f]ailing to disclose all conditions, charges, or fees relating to: a. The return of goods for refund, exchange, or credit. Such disclosure shall be by means of a sign attached to the goods, or placed in a conspicuous

public area . . . so as to be readily noticeable and readable . . . . If the supplier does not permit a refund, exchange, or credit for return, he shall so state on a similar sign." Va. Code Ann. § 59.1-200(A)(2), (6), (8), (14), (16)(a).

Here, the evidence shows that Montanile advertised specific baseball cards as being for sale, at least several of which she did not possess; that she represented that the six baseball cards at issue were of a certain quality when in fact she did not have some or all of the cards; and that she sold, accepted payment, and deposited the payment for six baseball cards that she did not have. These actions make Montanile liable under several provisions of § 59.1-200. *See Nigh v. Koons Buick Pontiac GMC, Inc.*, 319 F.3d 119, 129 (4th Cir. 2003), *overruled on other grounds by* 543 U.S. 50 (2004) (finding that a VCPA judgment "was supported by properly admitted evidence and was sufficient to establish that [the dealer] made material misrepresentations" that "were intended to deceive, did deceive, and caused loss"). The facts show that Botticelli was deceived into sending Montanile $7,280.00 for specific baseball cards of specific grades that she advertised but did not really possess. They also show that Montanile refused to return the money when the cards she promised him were not delivered, after agreeing to Botticelli's requirement of a money-back guarantee.

By advertising for sale goods of a certain quality that she did not in fact possess, Montanile misrepresented the source

of the goods she "sold"; she also misrepresented that those goods were "of a particular standard, quality, [or] grade." Va. Code Ann. § 59.1-200(2), (6). Montanile's own e-mail admissions establish that she "[a]dvertis[ed] goods . . . with intent not to sell them as advertised." *Id.* at § 59.1-200(8). Moreover, the entire pattern of Montanile's actions in this case establish that she used fraud, false pretenses, and misrepresentations in connection with the transaction. *Id.* at § 59.1-200(14). Montanile induced Botticelli to send her $7,280.00 for baseball cards that she advertised as being for sale; her e-mails later indicated that she did not possess all of the cards at the time she made the sale, and additional evidence uncovered by the Fairfax County police suggested that she did not possess *any* of the cards. (Duncan Decl. Exs. 2, 6.) She deceived Botticelli about the availability of the cards and lied to him about when the cards would be shipped. (Duncan Decl. Ex. 2 ("I believe [the package] is on it's [sic] way & will send the tracking number shortly.")) When Botticelli did not receive the cards – and received instead an empty box – she refused to refund his money, which she had deposited into her own bank account weeks before. (Duncan Decl. Ex. 3.) Earlier, she had accepted Botticelli's offer to pay her for the cards upon the condition that she was offering a money-back guarantee. (Duncan Decl. Ex. 2.)

    Thus, even if a reasonable jury could find that Montanile actually shipped the six baseball cards via UPS, and

that the cards were somehow absconded with before Botticelli received the sealed box – a scenario which, for the reasons explained below, a reasonable jury could *not* find – there is ample and uncontradicted evidence showing that Montanile deceived Botticelli from the start about the goods she had for sale, about her business practices, and about the shipment of the cards. Botticelli is entitled to summary judgment on his VCPA counterclaim.

Given the Magistrate Order forbidding Montanile from testifying in her own defense, which the Court will uphold, it is also clear that, looking only at the evidence submitted by Botticelli and ignoring any self-serving justifications advanced by Montanile, a reasonable jury could only find that she completed her fraud by mailing Botticelli an empty box.  Taken together, the numerous misleading e-mails about shipping, Montanile's shipment of the package only after Botticelli threatened to talk to the police, the subsequent arrival of an empty box, and evidence tending to show that Montanile only began looking for the cards she had advertised *after* "selling" them to Botticelli, all lead to one conclusion: Montanile actively defrauded Botticelli of his money when she could not locate the cards she had "sold" him elsewhere in the marketplace.  Lastly, the evidence of Montanile's past sports memorabilia frauds perpetrated against Rev. Spencer and Coach's Corner supports a finding of intent, an absence of mistake or accident, and

knowledge on Montanile's part.  Fed. R. Evid. 404(b).  That
Montanile attempted to continue her fraud on Botticelli by filing
suit in this Court is nothing short of amazing.

> d. <u>Remedy</u>

The last remaining question concerns the remedy for
Montanile's VCPA violations.  Botticelli claims that, as a direct
result of Montanile's actions, he suffered actual pecuniary loss
in the amount of $20,400.00 – the value, today, of the cards that
he thought he was buying from Montanile.  (Huggins Decl. (Ex.
F).)  Montanile did not depose Botticelli's damages expert, a Mr.
Huggins, and did not offer her own expert on valuation or indeed
on any issue of damages.  Botticelli also claims to have suffered
additional damages for the wasted time, expense, aggravation, and
emotional distress he incurred as a result of Montanile's
actions.  *See Barnette v. Brook Road*, 429 F. Supp. 2d 741 (E.D.
Va. 2006) ("Under the [Virginia] Supreme Court's definition of
'actual damages,' the Court finds the VCPA authorized recovery
for emotional distress.").  He estimates these damages at
$7,500.00.

The VCPA permits treble damages for the actual loss
sustained as a result of a willful violation.  "The purpose of
Code § 59.1-204(A) is to provide a penalty for intentional
violations of the VCPA in addition to restitution for damages
incurred."  *Holmes v. LG Marion Corp.*, 521 S.E.2d 528, 532

31

(1999).  Whether to impose treble damages is left to the
discretion of the trier of fact.  *Id.*

      The case is currently set for a jury trial.  Thus, the
jury, as the finder of fact, will decide what damages Montanile
is responsible for and whether those damages should be trebled.

      2. <u>UPS's Motion for Summary Judgment</u>

      After the Magistrate struck Montanile's Amended
Complaint, UPS moved for summary judgment.  UPS argued that,
because Montanile no longer has any active claims against it, the
Court should grant summary judgment in UPS's favor.  Because the
Court will vacate the striking of the Amended Complaint and
substitute a non-dispositive sanction, the grounds for UPS's
summary judgment motion have disappeared.  Because Montanile
cannot testify in her own favor, however, and because the Court
has found that, given the only evidence submitted to the Court, a
reasonable jury could only find that Montanile lied about sending
the baseball cards, the Court finds it appropriate to grant
summary judgment on Montanile's claim against UPS.  That claim,
made pursuant to 49 U.S.C. § 14706, relied on Montanile's
allegations that she actually sent the baseball cards.  She did
not do so.  The Court will grant summary judgment to UPS on the
claim Montanile filed against it.

## IV.  Conclusion

      For the foregoing reasons, the Court will vacate in
part the Magistrate's Rule 37 sanctions, bar Montanile from

testifying in support of her claims, grant UPS's motion for summary judgment, grant Botticelli's motion for summary judgment as to Montanile's claims against him, grant Botticelli's motion for summary judgment as to his VCPA counterclaim against Montanile, and dismiss Botticelli's claim for specific performance.  The issue of damages will be set for a jury trial.

An appropriate Order will issue.


July 28, 2009                         _____/s/_____
Alexandria, Virginia                      James C. Cacheris
                                  UNITED STATES DISTRICT COURT JUDGE